UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

_____

No. 04-CR-10065-MLW
_____

UNITED STATES

v.

CLARENCE EARLE
_____

**POST-HEARING MEMORANDUM IN SUPPORT OF
DEFENDANT'S MOTION TO SUPPRESS STATEMENTS**

The Court held an evidentiary hearing on the defendant Clarence Earle's Motion to Suppress on October 7, 2005. This Post-Hearing Memorandum is submitted to address the legal issues that emerged at that hearing. See October 7, 2005 Order. In particular, it is offered to supplement the defendant's previous filings regarding: (1) whether the defendant received adequate warnings under Miranda v. Arizona, 384 U.S. 436 (1966); and, (2) if so, whether the defendant made an intelligent and knowing waiver of those rights.

**I.      STATEMENT OF RELEVANT FACTS.**

At the evidentiary hearing on October 7, 2005, the Court heard testimony from Lt. Daniel Linskey and Officer Peter Pasciucco. In relevant part, Linskey testified that he and other law enforcement officers made a rolling stop of the car in which the defendant was traveling. 10/7/2005 Transcript ("Tr.") at 12-13. He testified that the defendant was read his Miranda rights "on the side of the road in front of the *Boston Globe* on Morrissey Boulevard." Id. at 14. This was done by

Linskey, who read the warnings from a card he had in his wallet. Id. at 17-18. A copy of the card was introduced as Exhibit 1. Id. at 17. Linskey observed the defendant at the police station, undergoing booking, approximately 35 minutes later. Id. at 20-21. At that time, Linskey informed the booking officer "to enter my name in as for providing Miranda." Id. at 21. The booking sheet was introduced as Exhibit 2. Id. at 22. Linskey told the defendant "that these are the rights that I informed you of earlier. You've got to sign here and you have to sign for your property." Id. at 23. According to Linskey, "he [Earle] signed the form and I signed the form." Id. Linskey testified that the defendant was then placed in a cell, and then was interviewed in the detective's office. Id. at 24. This occurred within 20 minutes of the defendant's being booked. Id. at 25. Linskey was not involved in this interview. Id. Linskey stated that the defendant did not indicate that he was invoking his right to remain silent or his right to counsel. Id. at 26.

On cross-examination, Linskey stated that, when the defendant's car was stopped, six or seven or more officers approached the car with guns drawn. Id. at 36. Earle was "taken out of the car" and handcuffed. Id. at 36. Linskey described the scene, which he called a "fray," as follows:

> Well, Morrissey Boulevard, it's people driving home, and now you have eight police officers jumping out, in plain clothes, stopping the vehicle in traffic. There's a lot of yelling, trying to get a command presence across, insuring the suspect is unarmed. It's very dynamic, very fluid, very exciting. And if you're someone driving by, you're certainly looking at that as a significant event.

Id. at 37. Linskey acknowledged that people were shouting things at the defendant. Id. He said that the defendant was "taken over to the side of the road to the guardrail and at that point he was patted down for weapons." Id. at 38. Linskey said he "removed my card from my wallet and read the rights to him and to the female that was with him as well." Id. The defendant was then located in the

2

"breakdown lane," in the grip of a couple of officers, and handcuffed behind his back. Id. at 38-39. Linskey testified that, when he encountered the defendant at the police station, he did not give him the Miranda warnings again. Id. at 48. Rather, he said, "Sign here stating for the rights I read you earlier and sign here for your property." Id. at 48.

On direct examination, Pasciucco testified, in relevant part, that at the time the defendant's car was stopped, "we took him out of the car, threw him up against the car, just to pat him down, check for any weapons, and then we gave him his rights." Id. at 57. He testified that during the interrogation, "when he first came in the room, I asked him, had he been read his rights downstairs? Did he understand them? He said, 'Yes'." Id. at 59. Pasciucco acknowledged that he questioned the defendant regarding whether Theodore Wilson was his real name, and that the defendant told him about prior deportations. Id. at 59-60. Pasciucco stated that the defendant did not indicate that he did not want to speak with officers, nor did he invoke his right to remain silent or request to speak to an attorney. Id. at 62.

On cross-examination, Pasciucco reiterated that the defendant had been taken out of the car, frisked, handcuffed and had his rights read to him while he was "up against his car." Id. at 70-71. He described the subsequent interview at the police station:

> Yeah, when we first started talking to him, you don't dive right into what you want to know about, you know, we were just shooting the breeze a little bit. One of the issues that we had to straighten out with him was what his real name was. I believe they had some information that Theodore Wilson may not have been his real name. **So we just came in and asked him, you know.**

Id. at 75 (emphasis added).

## II. THE GOVERNMENT HAS NOT CARRIED ITS BURDEN TO ESTABLISH THAT THE DEFENDANT WAS ADEQUATELY INFORMED OF HIS MIRANDA RIGHTS.

### A. Summary of Applicable Law.

In order to introduce at trial a defendant's statements made in response to custodial interrogation, absent one of a limited number of exceptions, the Government must demonstrate that the defendant was given adequate warnings under Miranda. 384 U.S. at 479. The fact that a defendant may have independent knowledge of the rights covered by Miranda does not absolve law enforcement of the necessity of administering Miranda warnings. See United States v. Patane, 542 U.S. 630, 124 S.Ct. 2620, 2625 n.1 (2004). In Miranda, the Court noted that the explanation of the rights in question must be "effective and express," id. at 473 (right to counsel), and "clear and unequivocal," id. at 467-468 (right to remain silent). While there is no specific form that the warnings must take, the warnings must be a "fully effective equivalent" of the language approved in Miranda. See Duckworth v. Eagan, 492 U.S. 195, 202-203 (1989). The Supreme Court has noted that, "it would be absurd to think that mere recitation of the litany suffices to satisfy Miranda in every conceivable circumstance." Missouri v. Seibert, 542 U.S. 600, 124 S.Ct. 2601, 2610 (2004). Rather, the inquiry is whether the warnings "reasonably convey to a suspect his rights." Id., quoting Duckworth, 492 U.S. at 203.

### B. Application of Law to Facts.

The Government has not carried its burden of establishing that the Miranda warnings were given to the defendant in a clear or effective manner. On the contrary, the testimony at the evidentiary hearing establishes that, if the Miranda warnings were given at all[1], they were given in

---

[1] The testimony of the two officers was in direct conflict as to the location of any purported Miranda warnings.

very chaotic circumstances where the defendant was being physically restrained. There were eight police officers present in a "very dynamic" situation with officers jumping out of their cars, pulling their guns, and "a lot of yelling." The defendant had been pulled from his car, searched, handcuffed, and "thr[own] against [his] car." It was at that point, with traffic continuing to go by and with drivers looking on at the scene, that the defendant was allegedly given his Miranda rights, either while pressed against his car or while being held at the guardrail. The defendant was in the "grip" of a couple of officers at that time. There was no testimony that the defendant stated then that he understood his rights. There was no testimony indicating that the officers made any effort to ensure that the defendant could hear and comprehend the warnings, by, for example, taking him to a quiet location before the rights were read.

It would be folly to assume that the defendant could be able, or would be likely to, listen closely and understand the words being read to him in these circumstances. Rather, the reading of the Miranda rights in this situation was evidently regarded by law enforcement as a meaningless litany to be recited upon making an arrest, rather than a serious effort to inform a defendant of important constitutional rights. This conclusion is confirmed by the absence of any testimony that the defendant confirmed, at that time, that he understood his rights, or even that he nodded his head in understanding, appeared to listen closely, or maintained eye contact with the officer giving the warning. The testimony established, at best, that the Miranda card was read aloud in the vicinity of the defendant. That is not sufficient for the Government to carry its burden of proof to show that the defendant was effectively and reasonably informed of his rights.

This conclusion is not altered by the subsequent events at the police station, for the simple reason that it is undisputed that the defendant was *not* read his Miranda rights at the station. Linskey

admitted that he did not read the Miranda rights at the station, but merely told the defendant to sign the booking sheet. See Tr. at 48.[2] Pasciucco merely asked the defendant if he had been read his rights downstairs. Id. at 59. In the same way, there was no testimony that the defendant was given Miranda warnings prior to the interrogation. See id. at 59. At best, he was asked if he had been read his rights downstairs and whether he understood them, and he said, "Yes." Id. at 59.[3] Pasciucco also testified, however, that the defendant was questioned regarding his name "when we first started talking to him," before the substance of the interrogation began. Id. at 75.

The defendant was not given any effective Miranda warnings at the time of his arrest, and he was not given any Miranda warnings at all at the police station, and therefore his statements during the interrogation must be suppressed. To hold otherwise would elevate the form of the ritual above the substance of the rights protected by Miranda.

---

[2]There is no reason to believe that the defendant was informed of his rights at the police station through the booking sheet he signed. It is undisputed that he was not orally informed of his rights at the time he signed the sheet. The testimony established that the defendant signed as a result of a command by Linskey, who said, "**You've got to** sign here...." Tr. at 23 (emphasis added). This may well have conveyed the impression to the defendant that signing was merely a ministerial task (akin to signing for his property) and that he had no choice of whether to sign or not.

[3]While it is not material to this analysis, the Court may choose not to accept the testimony on this point, as it is undisputed that the defendant had not been "read his rights downstairs."

### III. THE GOVERNMENT HAS NOT CARRIED ITS BURDEN OF ESTABLISHING THAT THE DEFENDANT MADE A KNOWING AND INTELLIGENT WAIVER OF HIS RIGHTS.

    **A.    Summary of Applicable Law.**

        **1.    Any waiver must be knowing and intelligent.**

In order to waive rights under Miranda, a defendant must make a "knowing and intelligent" waiver. See Miranda, 384 U.S. at 475; United States v. Garcia, 983 F.2d 1160, 1169 (1st Cir. 1993). In determining whether a waiver is "knowing and intelligent," the Court must consider the "totality of the circumstances and the facts surrounding the particular case, 'including the background, experience, and conduct of the accused'." Garcia, 983 F.2d at 1169, citing North Carolina v. Butler, 441 U.S. 369, 374-375 (1979). Any waiver "must be made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." Moran v. Burbine, 475 U.S. 412, 421 (1986). A "heavy burden" to demonstrate knowing and intelligent waiver rests on the Government. Miranda, 384 U.S. at 475; see also Colorado v. Connelly, 479 U.S. 157, 168 (1986) (burden on prosecution to prove waiver by preponderance of evidence). In Tague v. Louisiana, 444 U.S. 469 (1980), the Court found that the prosecution had not carried its burden when the arresting officer testified that he had read the rights to the petitioner from a card, and that he could not recall whether he asked the defendant if he understood those rights or if he rendered any tests to determine whether the defendant was literate or otherwise capable of understanding the rights. The Court concluded, "In this case no evidence at all was introduced to prove that petitioner knowingly and intelligently waived his rights before making the inculpatory statement." Id. at 471.

Courts have on occasion relied on a defendant's prior or subsequent exercise of his or her rights to support the inference that the defendant actually understood those rights. See, e.g., United States v. Andaverde, 64 F.3d 1305, 1314 (9th Cir. 1995) ("the fact that [the defendant] later in the interview expressly invoked his right to silence demonstrates that he was conscious of his right to remain silent, and that he was cognizant of the need to do so"); Bui v. DiPaolo, 170 F.3d 232, 240 (1st Cir. 1999) (collecting cases). In United States v. Andrade, 135 F.3d 104 (1st Cir. 1998), the defendant had, during the course of his interrogation, refused to answer questions from an INS agent regarding his immigration status. He subsequently submitted to questioning from other officers. The Court of Appeals noted that the defendant understood that he had a right to remain silent which would be honored. Id. at 107. While acknowledging that it was a close issue based on Miranda and Butler and the absence of a written waiver, the Court in Andrade found, based on the defendant's prior exercise of his rights and a perceived "rational reason" for speaking, that he had waived his Miranda rights. Id. at 107-8.

**2.    There must be an actual waiver.**

The Supreme Court and lower courts have been consistent in emphasizing that a defendant must not merely understand his Miranda rights, but must also actually waive them for any confession to be admitted at trial. In United States v. Christian, 571 F.2d 64 (1st Cir. 1978), the Court of Appeals wrote:

> There is no question that appellant was read his rights and that he understood them. By his own testimony at trial he admitted as much. The only question is whether he waived those rights. These are distinct questions. ... [B]oth warnings and waiver are prerequisites. One cannot substitute for the other.

8

Id. at 68; see also United States v. Porter, 764 F.2d 1, 7 (1st Cir. 1985) ("Merely asking the accused whether he understood his rights does not satisfy the duties of an interrogating officer or make any statement the accused might then make admissible.  Miranda requires the interrogating officer to go further and make sure that the accused, knowing his rights, voluntarily relinquishes them.").  The Supreme Court has held that courts "must presume that a defendant did not waive his rights." Butler, 441 U.S. at 373.

In Miranda, the Court explained:

> An express statement that the individual is willing to make a statement and does not want an attorney followed closely by a statement could constitute a waiver. But a valid waiver will not be presumed simply from the silence of the accused after warnings are given or simply from the fact that a confession was in fact eventually obtained. A statement we made in Carnley v. Cochran, 369 U.S. 506, 516, 82 S.Ct. 884, 890, 8 L.Ed.2d 70 (1962), is applicable here:
>> 'Presuming waiver from a silent record is impermissible. The record must show, or there must be an allegation and evidence which show, that an accused was offered counsel but intelligently and understandingly rejected the offer. Anything less is not waiver.'

384 U.S. at 375.[4]  While the Court has clarified than an explicit waiver is not always necessary and that sometimes waiver can be inferred from "actions and words," it has not retreated from the principle that silence alone cannot support an inference of waiver.  See Butler, 441 U.S. at 373 (rejecting per se rule requiring explicit waiver).  See also 2 LaFave, Israel & King, Criminal Procedure § 6.9(d) at 591 (2d ed.1999) ("a waiver is not established merely by showing that a defendant was given the complete Miranda warnings and thereafter gave an incriminating

---

[4]By "silence," the Court does not mean that the defendant must remain silent throughout the interrogation.  If that were the case, clearly, there would be no statement to suppress and the issue would never arise.  Rather, the Court is referring to the situation where the defendant is silent as to whether he wishes to invoke or waive his Miranda rights.

9

statement"); William E. Ringel, Searches & Seizures, Arrests and Confessions § 28:14 at 28-32 (2d ed.) ("It is doubtful that the Court [in Butler] meant that silence plus such conduct as a willingness to answer questions is sufficient to constitute a waiver").

The First Circuit has outlined a few circumstances in which a court may infer a waiver in the absence of an express waiver:

> [T]here are certain types of cases in which courts routinely conclude that a defendant who has professed an understanding of his right to remain silent has waived that right. For example, a defendant will be held to have effected a waiver when, after receiving warnings and asserting (equivocally or unequivocally) a right to remain silent, he spontaneously recommences the dialogue with his interviewers. ... So, too, if a defendant's incriminating statements were made either as part of a "steady stream" of speech, ..., or as part of a back-and-forth conversation with the police, ..., courts regularly have found waivers. A waiver of Miranda rights also may be implied when, after having received Miranda warnings, a criminal defendant responds selectively to questions posed to him.

Bui, 170 F.3d at 240 (citations omitted).[5]  In Bui itself, waiver was found after the defendant, instead of stopping after stating he had nothing to say, proceeded to ask officers, "who said I did this?" Id. at 241. This "confirmed that the interview was indeed a back-and-forth exchange." Id.

---

[5]By "back-and-forth conversation," the court is alluding to a situation where the defendant is asking questions of the police officers in addition to answering them. See Baskin v. Clark, 956 F.2d 142, 146 (7th Cir. 1992), cited in Bui, 170 F.3d at 240.

By "steady stream of speech," the court is alluding to a situation where a defendant references his right to remain silent and then, "in the same breath," makes a further statement. See Bradley v. Meachum, 918 F.2d 338, 342-343 (2d Cir. 1990), cited in Bui, 170 F.3d at 240.

    **B.**    **Application of Law to Facts.**

        **1.**    **The Government has not carried its burden of showing that any waiver was "knowing and intelligent."**

The record is almost completely bereft of evidence that the defendant understood his Miranda rights and therefore was in a position to knowingly and intelligently waive them. As argued above, the Government did not adduce any evidence showing that the defendant understood the Miranda warnings when they were given to him at the time he was arrested. There was no testimony that he was listening intently, was nodding his head, or that he acknowledged an understanding of the rights at that time. In fact, the evidence indicates that the defendant was read his rights, if at all, in the midst of a chaotic, noisy, and dynamic scene. The defendant can hardly be expected to have gained an understanding of the "nature of the right[s]" in such a situation. Similarly, the Government did not adduce any evidence showing that the defendant gained an understanding of the rights in question at any subsequent time, beyond the fact that -- in response to an officer's command that "you've got to sign here" -- he signed a sheet indicating that he understood what he had been told and, subsequently, told an officer that he understood the rights that had been read to him downstairs (when, of course, it is undisputed that no one read him his rights downstairs). Nor was there any evidence that the defendant subsequently invoked any of his rights, which might indicate that he had an understanding of them. Taken together, these facts fall far short of establishing the "heavy burden" that the Government must carry to prove that the defendant understood his rights and therefore could effect a knowing and intelligent waiver.

**2.   The Government has not carried its burden of showing that the defendant waived his rights.**

Even if the Court finds that the defendant understood his rights, the Government has presented no evidence *at all* indicating that the defendant actually waived those rights, beyond the mere fact that he answered the interrogator's questions. In fact, there was no evidence that the defendant was even asked if he was willing to waive his rights. Under Supreme Court and First Circuit precedent, this is insufficient to overcome the presumption that a defendant did not waive his or her rights. The Government cannot argue that there must have been a waiver "simply from the fact that a confession was in fact eventually obtained," Miranda, 384 U.S. at 375, and yet the Government presented no other evidence at the hearing indicating a waiver. This case does not fall into any of the paradigms for implied waiver described by the First Circuit in Bui; on the contrary, the defendant was subjected to questioning by the officers, with no affirmative conduct on his part beyond answering the questions and no evidence of selective responses. There is no evidence that the defendant made any spontaneous responses beyond answering the questions posed to him or that he asked any questions of the officers. If this situation is construed as an implied waiver, the waiver requirement of Miranda would be rendered an absolute nullity. Consequently, this Court should find that the Government has not met its burden of proving that the defendant actually waived his Miranda rights.

**Conclusion**

For the foregoing reasons, the Court should grant the defendant's motion and suppress the statements made by the defendant following his arrest on November 6, 2003.

Respectfully submitted
The defendant Clarence Earle
By his attorney

/s/ Charles W. Rankin

_____
Charles W. Rankin
BBO #411780
Rankin & Sultan
1 Commercial Wharf North
Boston, MA  02110
(617) 720-0011